# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| ANGUS M. DUTHIE and MICHAEL J. Condron, | ) ) ) |
| Plaintiffs, | ) No. 07 C 5491 ) |
| vs. | ) Magistrate Judge Jeffrey Cole ) |
| MATRIA HEALTHCARE, INC., | ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

In December 2005, one of Matria Healthcare's subsidiaries, Coral Acquisitions Corp., merged with CorSolutions Medical, Inc. in a deal valued at almost a half billion dollars. Complex transactions generally beget complex documentation. This one was no exception. The Agreement and Plan of Merger ("Merger Agreement") spanned 71 single-spaced pages, and critical provisions turned in on themselves with the endless sinuosity of a Möbius strip.[1] Like most agreements of its kind, it provided for post-closing adjustments, contemplated the possibility of disputes of varying kinds, and, depending on the dispute, provided for their resolution either through arbitration by the American Arbitration Association ("AAA") or other specified forms of enforceable, alternative dispute resolution. *See e.g., Omni Tech Corp. v. MPC Solutions Sales, LLC,* 432 F.3d 797 (7th Cir.

---

[1] "American law," the Seventh Circuit has said, is "needlessly complex, and occasions for simplification should be embraced." *Sullivan v. William A. Randolph, Inc.* 504 F.3d 665, 672 (7th Cir.2007) (Posner, J.). The same may be said of the kinds of commercial agreements involved in this case.

2005); *Creative Solutions Group, Inc. v. Pentzer Corp.,* 252 F.3d 28 (1st Cir. 2001). [2]

An Escrow Fund containing $20,300,000 of the merger consideration was established to satisfy post-closing adjustments of: Initial Merger Consideration (§ 2.9); Tax Disputes (§ 5.12(h); Escrow Fund Disputes (§7.4), and Benefits Improvement and Protection Act claims (§7.5(d)) with the remainder to be distributed as directed in the Merger Agreement. None of the stakeholders had any obligation to replenish or contribute any amounts to the Escrow Fund "under any circumstances." (§7.3(b)). The Merger Agreement provided that "Escrow Fund Disputes,"which were those claims involving any breaches of the representations, warranties, and covenants made by CorSolutions in the Merger Agreement and which sought to be satisfied from the Escrow Fund, were to be resolved by the American Arbitration Association. (Merger Agreement §7.4).

Matria has filed claims before the AAA against Messrs. Duthie and Condron personally, charging them with having made fraudulent misrepresentations and having fraudulently concealed material information in connection with the merger. Messrs. Duthie and Condron contend that the Merger Agreement does not permit the claims against them to be arbitrated.

Simply stated, the questions presented in this case are: 1) who makes the decision of arbitrability – a federal court or the American Arbitration Association panel; and 2) whether the Merger Agreement makes arbitrable a claim "involving fraud" (no matter how styled) where the claim is not against the Escrow Fund, but against corporate officers personally and seeks

---

[2] Post-closing disputes over adjustments for items on the closing date balance sheet were to be resolved by Ernst & Young. (Merger Agreement, §2.9(b)). Post-closing tax disputes were to be submitted to a Tax Arbitrator. (§5.9(h)). "BIPA Claims" were to be submitted to a BIPA Arbitrator. (§7.5).

compensatory and punitive damages from them totaling perhaps as much as $120 million.[3] Matria has conceded that its suit against Messrs. Duthie and Condron before the AAA is indeed against them personally and seeks recovery from their personal assets. (Joint Stipulation ¶ 31). If Messrs. Duthie and Condron are right, the court is to make the determination of arbitrability, and Matria must be enjoined from proceeding with its arbitration claims against them. The parties have consented to jurisdiction pursuant to 28 U.S.C. §636(c).

## I.

## FACTUAL BACKGROUND [4]

The Coral Acquisitions–CorSolutions merger closed in January 2006 with CorSolutions becoming the surviving corporation. At the time of the merger, CorSolutions had about 50 million shares on a common equivalent basis outstanding, which included all common, preferred, warrant, and option holders. It had more than 450 common and preferred shareholders, with the majority of shares held by large, institutional investors, venture capital, and equity funds. (*Joint Stipulation*, ¶¶ 18-20). Once the merger was completed, CorSolutions stockholders were entitled to exchange their shares for cash proceeds that were to be paid out of the "Initial Merger Consideration." (*Complaint*, Ex. A, Merger Agreement, at §§ 1.1, 2.3).

At the time of the merger, Mr. Duthie owned 2,556 shares of CorSolutions Common Stock

---

[3] At oral argument counsel for Matria said that there was approximately $16.5 million remaining in the Escrow Fund and he estimated damages from the alleged fraud at between $60 and $120 million. It was his contention that notwithstanding § 7.3(b)'s very explicit limitation on damages to the corpus of the Escrow Fund, the Merger Agreement permitted a recovery against the Escrow Fund that exceeded its corpus, with the excess binding on the stakeholders.

[4] The parties have stipulated to most of the facts, *see* Joint Stipulation, and the documentary evidence is not the subject of any contention, save of course the meaning of the Merger Agreement.

3

and 75 shares of CorSolutions Series C Preferred Stock, as well as 182,000 stock options. His shares represented less than one-half of one percent ownership interest in the company. He reaped over $800,000 on those options in the wake of the merger. Mr. Condron held 1,000,000 stock options in CorSolutions at the time the Merger Agreement was executed, and executed 124,000 after it was signed, receiving over $1,145,000 in payment. Following the closing, he exercised the other 876,000 options, and received another $3.5 million. His one million shares were a 2.4% ownership interest in the company. (*Joint Stipulation*, ¶¶ 1-16). The Merger Agreement called individuals like Messrs. Duthie and Condron "Stakeholders." Pursuant to §2.4(a) of the Merger Agreement, the Stakeholders appointed Coral SR LLC to act as their representative, agent and attorney-in-fact "for all purposes under this Agreement, the Escrow Agreement and the Agent's Escrow Agreement." (Merger Agreement, at § 2.4(a)).

Almost immediately after the merger, disputes arose over whether a particular matter was to be arbitrated by Ernst & Young or tried in court. Matria sued in the Chancery Court of Delaware to require Coral SR to submit the dispute to Ernst & Young. Ultimately, Matria pled two counts of fraud against Coral SR in its capacity as stakeholder representative (to be satisfied out of the Escrow Fund) based upon the claimed intentional misrepresentations and fraudulent concealment of certain material facts by officers of Coral Solutions. The court held that the proper forum for the accounting dispute was Ernst & Young and concluded that since Matria's claims for fraud were *claims on the Escrow Fund*, they should be dismissed. In the court's view, "regardless of whether [the claimed misrepresentations and omissions] are serious enough to be characterized fairly as fraud, they are to be resolved in the arbitration forum and not before a court." *Matria Healthcare, Inc. v. Coral SR LLC*, 2007 WL 763303 at *8.

4

Although the Chancery Court's opinion said nothing about claims involving fraud against corporate officers personally (rather than the Escrow Fund), Matria filed a three-count counterclaim in the AAA arbitration against Messrs. Duthie and Condron personally, seeking compensatory and punitive damages against them. In paragraph after paragraph, Matria accused them of having devised and executed a scheme to defraud and deceive Matria by withholding critical information, inflating revenues, and making numerous misrepresentations. *See e.g.*, Counterclaim, ¶¶ 33, 36, 39, 56-60, 65, 70. Count I of the Counterclaim explicitly charged "fraud." Count II charged "equitable fraud," and Count III charged breach of contract. Counts II and III were based upon the acts and omissions alleged in Count I.

Count I concluded by alleging that Messrs. Duthie and Condron's fraud justified an award of punitive damages – even though §7.4 expressly prohibited an AAA panel from awarding punitive or similar damages, and §7.3(iv) stated that "[i]n no event shall any party hereto be liable for, and [Matria] acknowledges and agrees that the term 'Damages' expressly excludes any consequential, treble, punitive or other damages not expressly provided for in this Article VII." Messrs. Duthie and Condron moved to dismiss the claims on jurisdictional grounds. Coral SR sought to dismiss the counterclaim since it sought relief beyond the monies in the Escrow Fund and punitive damages which could not be awarded under the Merger Agreement.

In a brief order, the Panel said that the issues presented by the motions "are complex and not free from doubt." The order recited the view of two members of the Panel who concluded that the ultimate resolution of these issues will benefit from the development of a fact record. Consequently,

5

two arbitrators voted to deny all the motions without prejudice.[5] Panelist Bittner would have granted

the motions of Messrs. Duthie and Condron to dismiss for lack of jurisdiction. Messrs. Duthie and

Condron then brought this action seeking a declaration that the fraud claims against them were not

arbitrable and a preliminary injunction barring Matria from proceeding with the arbitration claims

against them.

## II.
## ANALYSIS

### A.
### Standards For Injunctive Relief

The standards for determining entitlement to injunctive relief are familiar. The moving party

must demonstrate that: 1) a reasonable likelihood of success on the merits of its claim; 2) there is

no adequate remedy at law; 3) it will suffer irreparable harm if injunctive relief is not granted, and

that that harm outweighs the harm the opposing party will suffer if it is; and 4) the injunctive relief

will not harm the public interest. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d

616 (7th Cir. 2007); *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

### B.
### The Plaintiffs Have Not Waived Their Right to Contest Arbitrability

Before turning to the merits, two questions must be answered. The first relates to Matria's

claim that since the arbitrators by a 2-to-1 vote denied Messrs. Duthie and Condron's motion to

---

[5] Why factual elaboration would inform a determination of whether the claims against Messrs. Duthie and Condron were properly before the Panel, the order did not explain. Suppose fraud were proved. Would that provide a basis for dismissal – the motions were denied without prejudice – or a basis for concluding that arbitration jurisdiction existed from the beginning. And what if fraud were not proved? What then? The whole idea of a threshold jurisdictional determination is to avoid the very trial that two of the arbitrators concluded was necessary to properly inform the determination of who should hear the claim, the arbitration panel or a court.

dismiss the claims against them, they should not be allowed to have another go at it in the district court, but rather must see the arbitration through to its ultimate conclusion and then seek relief in the district court. Any other course, it is contended, would result in the needless squandering of everyone's time and resources, and thus contravene what Matria contends is the federal policy favoring the swift arbitration of claims.

Matria's economic analysis is unconvincing. Indeed, the course chosen by Messrs. Duthie and Condron is far more economical than that suggested by Matria. By seeking court resolution now, the time and expense of protracted proceedings before the arbitrators are saved. Moreover, Matria's policy argument misperceives federal policy in this area and is foreclosed by *First Options of Chicago v. Kaplan*, 514 U.S. 938 (1995). The facts are these: Mr. Kaplan opposed arbitration and filed objections with the panel, which decided it had the power to determine whether the dispute was arbitrable. The arbitrators went on to find against Mr. Kaplan, who then moved to vacate the award in the district court. 514 U.S. at 940-41.

There, First Options contended that Mr. Kaplan was stuck with the adverse finding by the arbitrators since by contesting arbitrability in the arbitration, rather than seeking to enjoin the arbitration or refusing to participate, he had manifested an intent to be bound by the panel's decision. That argument was augmented by an economically based pitch like that made by Matria: allowing parties to contest arbitrability before the arbitrators without being bound by the result would cause delay and waste in the resolution of disputes. 514 U.S. at 946. The Supreme Court deemed the delay and waste argument inconclusive, for "factual circumstances vary too greatly to permit a confident conclusion about whether allowing the arbitrator to make an initial arbitrability determination would, in general, slow down the dispute resolution process." *Id.* at 946. Moreover,

7

it was rejected as "legally erroneous," for the "basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, but to ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms and according to the intentions of the parties." *Id.* at 946.

## C.
## In This Case, The Question Of Arbitrability Is For The Court

The second question is whether the power to determine arbitrability resides with the court or the AAA Panel. The answer turns upon what the parties agreed to about that question in the Merger Agreement. *First Options*, 514 U.S. at 943. The Supreme Court has left no doubt that whether the parties have submitted a particular dispute to arbitration (i.e., the question of arbitrability) is an issue for judicial determination unless they "clearly and unmistakably" provided otherwise in their agreement. *Howsam v. Dean Witter Reynolds Inc.*, 537 U.S. 79, 82 (2002); *Employers Ins. Co. of Wausau v. Century Indem. Co.*, 443 F.3d 573, 576 (7th Cir. 2006); *James & Jackson, LLC v. Willie Gary LLC*, 906 A.2d 76, 80 (Del. 2006). The Supreme Court put it this way in *Howsam*:

> Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. *See [First Options] id.*, at 943-946 (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546-547 (1964)(holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. [Citations omitted].

537 U.S. at 84 (Parentheses in original).

At least linguistically, the "clear and unmistakable" standard is akin to the "clear and

8

convincing" standard, which the Supreme Court has defined as placing in the ultimate factfinder an abiding conviction that the truth of the factual contentions is "highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). *See also Cruzan by Cruzan v. Director Missouri Dept. of Health*, 497 U.S. 261, 285 (1990); *Parker For Lamon v. Sullivan*, 891 F.2d 185, 188 (7th Cir. 1989).[6]

The Delaware Supreme Court has held that where an arbitration clause provides for arbitration of "all disputes" (or "any dispute") arising out of an agreement and also incorporates AAA rules (or some other set of arbitration rules) that empower arbitrators to decide arbitrability, there is clear and unmistakable evidence that the parties want the question of whether the agreement covers a particular dispute to be decided by the arbitration panel. *See James & Jackson, LLC v. Willie Gary LLC*, 906 A.2d 76, 80-81 (Del. 2006)(collecting cases). *See also, Matria Healthcare, Inc.*, 2007 WL 763303 at *5. Absent such an all-encompassing clause, there is missing the clear and unmistakable evidence necessary to conclude that the parties agreed that the question of arbitrability was for the arbitrators. *James & Jackson, LLC*, 906 A.2d at 81.

In the instant case, there is not clear and unmistakable evidence that the parties agreed that questions of arbitrability were to be for the arbitrators. *Matria Healthcare, Inc.*, 2007 WL 763303 at *5. The Merger Agreement did not provide for arbitration by the AAA of all disputes. It provided for arbitrability of only four claims: Post-Closing Adjustments of Initial Merger Consideration (§ 2.9); Tax Disputes (§ 5.12(h)); Escrow Fund Disputes (§7.4), and Benefits Improvement and

---

[6] The function of any standard of proof is to indicate the degree of confidence society thinks a factfinder should have in the correctness of factual conclusions for a particular type of adjudication. By informing the factfinder in this manner, the standard of proof allocates the risk of erroneous judgment between the litigants and indicates the relative importance society attaches to the ultimate decision. *Colorado*, 467 U.S. at 315-16. The requirement that the evidence be "clear and unmistakable"would appear to manifest the Supreme Court's judgment that the risk of error is to be borne by the party seeking to deny a court the authority to decide the arbitrability of a particular matter.

9

Protection Act claims (§7.5(d)). *See also* § 9.7 (reiterating that these were the arbitrable claims). Non-arbitrable disputes were to be heard by the courts of Delaware. (Merger Agreement, §9.7). Matria does not argue otherwise, leaving unanswered the plaintiffs' contention that the question of arbitrability is for the court. Generally, a party's failure to respond to an opposing party's argument implies concession. *Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 643, n.7 (7th Cir.2006); *MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc.,* 2006 WL 3542332 at *3 (N.D.Ill.2006) (Moran, J.). *Compare Law v. Medco Research, Inc.,* 113 F.3d 781, 787 (7th Cir. 1997)(Posner, C.J.)("Failure to contest a point is not necessarily a waiver, but it is a risky tactic, and sometimes fatal."). Apart from this default, the Supreme Court has said that a court should decide whether an arbitration contact bound parties who did not sign the agreement. *Howsam,* 537 U.S. at 84.

**D.**

### There Is A Likelihood Of Success On The Merits Since The Merger Agreement Does Not Require Arbitration Of Fraud Claims Against Messrs. Duthie and Condron Individually Seeking Recovery Not From The Escrow Fund But From Their Personal Assets

a.

"'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Howsam,* 537 U.S. at 83. In deciding which disputes the parties agreed should be arbitrated, a court looks to ordinary state law principles that govern the formation of contracts. *First Options,* 514 U.S. at 943; *NAMA Holding, LLC v. Related World Market Center, LLC,* 922 A.2d 417 (Del.Ch. 2007)(presumption in favor of arbitration "will not trump basic principles of contract interpretation."). Here, Delaware law controls. (Merger Agreement, § 9.6).

10

In Delaware, as elsewhere, a court attempting to divine the intent of the parties begins with the language of the contract. In construing the meaning of any document, whether it be a statute or a contract, the principal determinant of the meaning of the text is context. *See Textron Lycoming Reciprocating Engine Division v. United Automobile, Aerospace & Agricultural Implement Workers of America Intern. Union,* 523 U.S. 653, 657 (1998); Scalia: A Matter of Interpretation: Federal Courts and the Law, 135 (1997). Words which may seem plain when viewed in isolation may take on a very different cast when viewed in the broader context of the entire agreement. *See OSI Systems, Inc. v. Instrumentarium Corp.,* 892 A.2d 1086, 1093, N.19 (Del. Ch. 2006).

Thus, a contract is to be read as a whole and should be read where possible so as to reconcile and harmonize all of its provisions. *Kaiser Aluminum Court v. Matheson,* 681 A.2d 392, 395 (Del. 1996); *New Castle County, Del. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 174 F.3d 338, 349 (3rd Cir. 1999). *See also Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 59 (1995). To that end, a court should look to the agreement's "overall scheme or plan." *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108 (Del. 1985). For example, in *James & Jackson, LLC,* the arbitration clause began by requiring arbitration of "any controversy" arising out of or relating to the LLC Agreement in accordance with the rules of the American Arbitration Association. The apparent textual clarity vanished in light of other provisions authorizing injunctive relief and specific performance in the courts and led the Delaware Supreme Court to conclude that not all disputes had to be referred to arbitration. 906 A.2d at 81.

The text, structure, and manifest purpose of Article VII – the Article the parties concede governs this case – compels the conclusion that Matria's claims against Messrs. Duthie and Condron personally and which seek satisfaction not from the Escrow Fund but from their personal assets are

11

not Escrow Fund disputes and thus are not arbitrable.

**b.**

Consistent with and expressing its dominant theme, Article VII is titled "Claims on Escrow Fund." The phrase "a claim on the Escrow Fund" (or "a claim against the Escrow Fund") appears not less than 13 times in Article VII. Section 7.1 authorizes Matria to make a written claim against the Fund for damages – which are broadly defined (Merger Agreement §7.1 (a)) – arising out of or relating to any noncompliance with or breach of any covenant or agreement with CorSolutions contained in the Merger Agreement or arising out of an investigation by the United States Attorneys Office for the Northern District of Illinois. (Merger Agreement §§7.1(b)-(c)).

Except for claims "involving fraud," [7] the right to make a claim on the Escrow Fund is the "exclusive remedy" under the Merger Agreement for any noncompliance with or breach of or inaccuracy in any misrepresentation. (Merger Agreement §7.3(d)(iv)). The Merger Agreement contained carefully crafted limitations on claims on the Escrow Fund. It imposed a ceiling on the recovery of damages, measured by the amount available in the non-replenishable Escrow Fund (Merger Agreement §7.3(b)), prohibited recovery of any consequential, treble, punitive or other damages not expressly provided for in Article VII (§7.3(c)(iv)), shortened the statute of limitations for the bringing of such claims (§7.3(d)(ii)),[8] and required that any claim or cause of action against

---

[7] Qualifying claims would include not only fraud, but equitable fraud, breach of contract, or any other claim, however denominated, so long as it "involv[ed]" fraud. The title Matria chose for the claim would not be determinative, for a claim is measured by its substance, not the designation chosen for it by the pleading's author. *See Curry v. United States*, 507 F.3d 603, 604 (7th Cir. 2007); *Guyton v. United States*, 453 F.3d 425, 426 (7th Cir. 2006); *Pernice v City of Chicago*, 237 F.3d 783, 786 (7th Cir. 2001); *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir. 1961), *cert. denied*, 365 U.S. 944 (1962).

[8] The idea was that there would be a deadline for any claims, so that the merger could, at some point not terribly far off, "set," as it were, undisturbed. Some of the Company's warranties would survive 12 (continued...)

12

any of the parties or their respective directors, officers or employees based upon, directly or indirectly, any of the representations or warranties, covenants or agreements contained in the Merger Agreement be brought "only as expressly provided in this Article VII" (§7.3(d)(ii)),. (§7.3(d)(iv)).

While §7.3(d)(iv) left no doubt that where a claim involved fraud, Matria was not limited to a claim on the Escrow Fund, it did not preclude such a claim or pretend to require that it must be brought before the American Arbitration Association. Nor did §7.4. Section 7.4 only required that "Escrow Fund Dispute[s]" were to be exclusively resolved by the AAA. (Merger Agreement §7.4). It did not prescribe the forum for non-Escrow Fund disputes (*i.e.,* those that did not seek recovery from the Fund). In addition to limiting the AAA's jurisdiction to these claims,[9] §7.4 repeated the prohibition against any award of damages in excess of compensatory damages with respect to Escrow Fund disputes, and stressed that each party "irrevocably waived" any right to recover punitive, exemplary or similar damages with respect to any Escrow Fund dispute. (*See also* §7.3(iv)). The parties had earlier in the Merger Agreement renounced any right of rescission. (§7.3(d)(iv)).

What emerges from a reading of the Merger Agreement as a whole is the parties' desire that any claim for any breach of or inaccuracy in any representation or warranty – whether intentional or inadvertent – which was to be satisfied from the corpus of the Escrow Fund, was to be arbitrated.

---

[8](...continued)
months, and some 24 – which was the limitations period for claims against the Escrow Fund. (Merger Agreement, §7.3(d)(l)). Matria was entitled to look to the Escrow Fund for §7.1 "Damages" on claims other than those listed in §7.1(a) – which were subject to a 12 month limitation, for 24 months.

The significantly reduced period for the bringing of claims would seem incompatible with the idea that the parties contemplated that claims involving fraud brought against CorSolutions officers personally and seeking recovery from them and not the Escrow Fund were arbitrable.

[9] Benefits Improvement and Protection Act (BIPA) claims were also to be arbitrated by the AAA, but they are not at issue here.

Where fraud was involved, a claim on the Escrow Fund was permissible, but not mandatory. That the Merger Agreement envisioned the possibility of a claim on the Escrow Fund for fraud is further supported by the Agreement's explicit allowance of a claim against the Escrow Fund for damages resulting from the investigation by the U.S. Attorneys Office, which was looking into the possibility of fraudulent conduct by CorSolutions' officers. (§ 7.1(c)).

For claims involving fraud, Matria was free to maintain whatever actions were appropriate in the courts of Delaware, where there would be a longer limitations period than that prescribed by the Merger Agreement and there would be no prohibitions against punitive damages or artificial ceiling on compensatory damages. The defendants in turn would have whatever substantive and procedural rights the law Delaware allowed in such cases, not the least of which would be trial by jury. This carefully crafted lattice work allowed Escrow Fund Disputes involving fraud related claims to proceed in arbitration under the restrictions imposed by Article VII without offending the Delaware courts' distaste for immunizing fraud and jeopardizing the validity of the Merger Agreement as applied to claims on the Escrow Fund where fraud was involved. *Abry Partners V., L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1061, 1064 (Del.Ch. 2006).

### c.

Matria's argument that its claims must be arbitrated is based not on the terms of the Merger Agreement, but upon inferences drawn from the Merger Agreement's silence on the matter – a perilous endeavor in the best of circumstances, *United States v. Hale*, 422 U.S. 171, 176 (1975); ; Posner, Cardozo: A Study In Reputation, 37 (1990), and one that in this case cannot be justified. Given the very explicit restrictions on the arbitrators' powers in the context of Escrow Fund disputes, it is not reasonable to conclude that by indirection and omission they intended to grant

those powers in the context of claims against former officers personally. While doubts about arbitrability should be resolved in favor of arbitration when a "reasonable" interpretation of an arbitration agreement points in that direction, a court "is not required to grasp at straws and interpret an arbitration agreement in a reasonable manner just to blindly vindicate the broad public policy that supports arbitrating disputes." *NAMA Holdings, LLC v. Related World Market Center, LLC*, 922 A.2d 417, 431 n. 30 (Del.Ch. 2007).

The parties to the Merger Agreement were commercially sophisticated, as were their counsel. They had every incentive and the means to say what they intended. *Confold Pacific, Inc. v. Polaris, Industries*, 433 F.3d 952, 955 (7th Cir. 2006)(Posner, J.). And they did. Indeed, they took great care to ensure that there would be no misunderstanding about the scope and effect of a consent to jurisdiction clause as it related to the four categories of disputes that various sections of the Merger Agreement relegated to arbitration. (*See* §9.7, discussed *infra* at 19).

Had they intended claims involving fraud against any of the stakeholders personally to be included within §7.4, they would not have chosen the most obscure and unreasonable means of effectuating that intent. Rather than tersely excluding such claims from the exclusive remedy provision (§7.3(d)(iv)) and making no mention of anything other than Escrow Fund disputes in §7.4, these highly sophisticated parties would have said something along these lines:

Notwithstanding anything to the contrary in Article VII, claims involving fraud against any of CorSolutions' former officers or directors shall also be arbitrated before the American Arbitration Association, which can award any remedy or relief available under Delaware law including, without limitation, the awarding of punitive damages.

It is profitable to compare the arbitration and exclusive remedy clauses in this case with those in cases that have required arbitrability of fraud-related claims. Those clauses typically were phrased

15

in broad terms requiring arbitration of "any claims" relating to or arising out of a particular transaction. The ordinary meaning of "any" is quite broad; it is almost always a term of unlimited inclusion. See *Union Pacific R. Co. v. United States*, 313 U.S. 450, 463 (1941); *Okeke v. Gonzales*, 407, F.3d 585, 593 (3rd Cir. 2005). Hence, in those cases, there was an unqualified submission of disputes, including those involving fraud, to the arbitrators. *See e.g., Cityfinancial, Inc. v. Newton*, 359 F.Supp.2d 545, 551 (S.D.Miss. 2005).

*Kerr-McGee Chemical, LLC v. Kemira Pigments Oy*, 2003 WL 22299045 (D.Del. 2003) is instructive. There, the arbitration clause provided that "any controversy claim or question of interpretation arising out of or relating to this agreement or the breach thereof shall be finally settled" by arbitration in London. According the words their plain meaning compelled the conclusion that fraud claims were arbitrable. Consistent with that interpretation, the clause granted the arbitrators unrestricted power to award "any remedy or relief" otherwise available including, "without limitation, specific performance . . . the awarding of punitive damages [and] the issuance of injunctive . . . relief. . . ." *Id*. at *2.

The exclusive remedies clause reinforced the all-encompassing nature of the arbitration provision. While noting that the Agreement, including the arbitration clause, set forth the exclusive rights and remedies of the parties to obtain damages with respect to matters arising under or in connection with the Agreement, the clause emphasized that it did not prevent or constitute a waiver of any claim based on the fraud or willful intentional misconduct or gross negligence any of the parties "or any of their respective employees, affiliates or representatives." *Id*. at *2-3. The district court thus concluded that the exclusive remedies provision "articulated the parties' intention to preserve their right to assert fraud claims, but did not remove fraud claims from the domain of the

16

arbitration clause. *Id.* at *4.

The Merger Agreement in this case contrasts sharply with that in *Kerr-McGee*. Here, the Agreement twice prohibited the arbitrators from awarding punitive damages, and rather than making "any" claim or controversy subject to AAA arbitration, the Agreement made Escrow Fund Disputes arbitrable before that body. Unlike the exclusive remedy provision in *Kerr-McGee* which made clear that the arbitration clause (along with the indemnification and specific performance clauses) provided the exclusive remedy for damages for claims of *any kind*, the exclusive remedy provision in the Merger Agreement expanded Matria right to maintain a suit for claims involving fraud to persons or entities other than the Escrow Fund. Unlike the clause in *Kerr-McGee*, it did not specify arbitration as the forum for the alternative suits.

### d.

The Delaware court that considered Matria's initial suit noted that a claim in arbitration against those former officers of CorSolutions who purportedly perpetrated the fraud was a "theoretical[] possib[ility]" – although the court did not explain its conclusion. *Matria*, 2007 WL 763303 at *8. Section 7.3(d)(ii) perhaps envisions such a claim, but if so it is one hedged about by the limitations so carefully built into Article VII. Thus while §7.3 speaks of any claim or cause of action against any of the parties "*or any of their respective directors, officers, employees,* affiliates, successors, permitted assigns or representatives *based upon, directly or indirectly, any of the representations or warranties, covenants or agreements contained in this Agreement,*" it explicitly directs that such a suit "may be brought *only as expressly provided in this Article VII.*" (§7.3(d)(ii))(Emphasis supplied). Thus such a suit could not result in a punitive damage award or an award that looked to reimbursement sources beyond the corpus of the Escrow Fund. Matria's

17

construction of the Agreement not only reads too much into the Exclusive Remedy clause, (§7.3(d)(iv)), but effectively reads out of the Agreement the remaining clauses of Article VII.

It is important to recall that Vice Chancellor Noble's comment about theoretical possibilities was made in the context of a case in which Matria had sought recovery not against Messrs. Duthie and Condron but against the Escrow Fund. 2007 WL 763303 at *9. Thus, his unexplained observations do not support Matria's argument that the case resolved the question of whether a suit against the individuals seeking recovery, including punitive damages, from their personal asserts is arbitrable. Matria's attempt to expand Vice Chancellor Noble's conclusion beyond the narrow context in which it was uttered and to use it as support for its present arguments ignores the basic principle that prior cases have precedential value only when there has been a deliberative consideration of the issue at hand. *Sub-silentio* or assumptive resolution is not enough. *See City of Kenosha v. Bruno*, 412 U.S. 507, 512-13 (1973); *Cohens v. Virginia*, 19 U.S. 264, 399 (1821)(Marshall, C.J.); *All-Tech Telecom v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (Posner, C.J.).[10]

---

[10] As the oral argument on this matter concluded, Matria asked to file a brief on its position that I was bound by the decision by the Delaware Chancery court. Despite the fact that the court had held only that Matria had to arbitrate fraud claims against the Escrow Fund – which is not inconsistent with the decision that claims involving fraud brought against officers and directors personally are not arbitrable – I allowed Matria to file an additional memorandum. (Dkt. # 24). Matria's brief raised a new argument, namely Messrs. Duthie and Condron were judicially estoppel by virtue of the Delaware court's opinion from contesting jurisdiction in the arbitration.

Judicial estoppel generally prevents a party who prevailed in one phase of a case on an argument from taking a contradictory position in another phase. *Zedner v. United States*, 547 U.S.489 (2006). Several factors typically inform the decision whether to apply the doctrine in a particular case, but one is of overriding concern here: the party must have succeeded in persuading a court to accept that party's earlier position. *Id.* Since the issue before the Delaware court was not the same as the issue here, the doctrine of judicial estoppel has no application.

(continued...)

"The soundness of a conclusion may not infrequently be tested by its consequences." Posner, Cardozo: A Study in Reputation, 118 (1990). *See also Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 741 (1985). If Materia is right, all 450 shareholders, be they individuals, institutional investors, or equity funds could be brought before the AAA Panel and be sued without any of the restrictions imposed on Escrow Fund Disputes. Nothing in the text or design of the Merger Agreement supports such a conclusion.

**c.**

Section 9.7 does not support Matria's argument that its claims against Messrs. Duthie and Condron must be arbitrated. Section 9.7 is captioned "Consent to Jurisdiction" and begins by noting that except as provided in the four sections requiring non-judicial resolution of claims, including Escrow Fund disputes, the parties have "irrevocably consent[ed]" to submit to the exclusive jurisdiction of the courts of Delaware for the purpose of any action or proceeding arising out of the Merger Agreement. The last sentence of that lengthy section states that "for the avoidance of doubt. . .any claims arising out of this Agreement, or the breach, termination or validity thereof shall be finally and exclusively determined by arbitration in accordance with §2.9 (Post-Closing Adjustments of Initial Merger Consideration), §5.12(h) (Tax Disputes), §7.4 (Escrow Fund Disputes), or §7.5

---

[10](...continued)

While the doctrine of judicial estoppel can be applied when parties are in privity, it is not clear that Messrs. Duthie and Condron are in privity with Coral SR from the Delaware proceeding. The Delaware court itself noted that Coral SR was not representing any Stakeholders as individuals. 2007 WL 763303, *8. In addition, Matria has failed to show that the Delaware was persuaded to accept the position Coral SR advanced in that proceeding. In Delaware, Coral SR argued that Matria's fraud claims were not "from and after the Closing," that they were not fraud claims at all, only breach of warranty claims, and that the Merger Agreement requires arbitration of all matters including any fraud claims. (*Matria's Post-Hearing Brief,* Ex. B, at 21-23). The Delaware court accepted none of these positions. It treated Matria's claims not as mere breach of warranty claims, but as fraud claims. 2007 WL 763303, *7. It specifically stated that it was not considering the "from and Closing" argument. *Id.* at *8 n.36.

(BIPA)."

When read in context, it is apparent that the last sentence was inserted by the parties to make clear that their irrevocable consents to the personal jurisdiction of the Delaware courts for the purpose of "any action arising out of this Agreement," should not be construed as modifying or eliminating the four arbitration provisions in the earlier sections of the Merger Agreement. Nothing supports the idea that the parties decided to insert at the very end of a section on page 69 of a 71 page single-spaced agreement a sentence that would constitute a substantial expansion of the arbitrator's jurisdiction. The final sentence of §9.7 seems more an example of the obsessiveness about which the Seventh Circuit has spoken, *TIG Insurance Co. v. Giffen Winning Cohen & Bowewes, P.C.,* 444 F.3d 587, 592 (7th Cir. 2006), than an attempt to craft a clause that in any way defined, let alone expanded, the jurisdiction of the American Arbitration Association.

**f.**

Matria's argues that while §7.3(b) of the Merger Agreement limits Matria's claims under Article VII to the Escrow Fund, §7.3(b) also states that this limitation is "[s]ubject to Section 7.3(d)." Section 7.3(d)(iv), in turn, explicitly excepts "claims involving fraud" from this limitation. Thus, Matria reasons, fraud claims are not subject to the strictures of Article VII, and the parties may assert claims above and beyond those provided for in Article VII in arbitration before the AAA. (*Matria's Brief in Response,* at 10). The argument rests on a misreading of the Merger Agreement.

Section 7.3(b) does not limit the types of claims Matria can bring; it simply sets in Escrow Fund disputes the maximum amount recoverable as the amount then existing in the Escrow Fund. Section 7.3(d) is captioned "Survival and Representations and Warranties; Claims Period." Sections (d)(I) and d(ii) deal with any claims on the Escrow Fund and require that any claim or causes of

action may be brought only as provided in Article VII. Section 7.3(d)(iv) merely exempts fraud from the Exclusive Remedy provision. Section 7.4, as explained above, merely directs that Escrow Fund disputes must be arbitrated and limits the powers of the arbitrator.

To say, as Matria does, that the combination of the language of §7.3(b) and §7.3(d)(iv) means that fraud claims are not subject to the strictures of Article VII is an unreasonable and untenable reading of the Agreement and is an odd argument for Matria to make because one of those strictures is arbitration. If fraud claims are not subject to such strictures, Matria's insistence that its suit for fraud against Messrs. Duthie and Condron must be arbitrated is self-defeating.

Next, Matria argues that under Delaware law, parties cannot contractually limit their damages for intentional torts. (*Matria's Brief in Response*, at 10). Although Matria leaves the argument essentially undeveloped, apparently its contention is the parties must have intended that claims involving fraud not directed against the Escrow Fund were arbitrable and there would be no restrictions on the authority of the arbitrators to award damages. The argument is illogical. First, only claims against the Escrow Fund are subject to the numerous restrictions in the Merger Agreement. *See* §7.3(b)(maximum liability), §7.3(c)(iv) (no punitive damages), §7.3(d)(i)(shortened periods of limitation for the bringing of claims), and §7.4 (no punitive damages). Since the Exclusive Remedy provision excludes from its ambit claims involving fraud, those claims may be pursued elsewhere unfettered by the limitations on claims on the Escrow Fund.

Matria then argues that the Delaware Chancery Court has already held that claims for fraud are arbitrable under the Merger Agreement, but that fraud claims are excepted from the other limitations of Article VII. (*Matria's Brief in Response*, at 10, *citing Matria Healthcare, Inc. v. Coral SR LLC*, 2007 WL 763303). The argument is unacceptable and ignores the context of Vice

Chancellor Noble's observations. Claims involving fraud are arbitrable under the Merger Agreement so long as they are directed to the Escrow Fund and thus subject to the limitations in Article VII. Vice Chancellor Noble never concluded that fraud claims are exempted from the limitations in Article VII. Nor did he hold that the claims against Messrs. Duthie and Condron personally had to be arbitrated. Rather, he made quite clear that he was only deciding the case before him, which was a suit by Matria against Coral SR – in its capacity as Stakeholder representative – against the Escrow Fund. There was no claim against officers and directors personally targeting the funds of an individual stakeholder. *Matria Healthcare, Inc.*, 2007 WL 763303 at \*8. Under the Merger Agreement, the court said, it would be wrong to allow litigation between Matria and Coral SR "with respect to Matria's *claims to the Escrow Fund* . . . . " *Id.* (Emphasis supplied).

### g.

Because the parties to the Merger Agreement did not agree to arbitrate claims against Messrs. Duthie and Condron, personally, it is not necessary to resolve the second issue the plaintiffs present: whether *they* agreed to arbitrate anything at all. Conceding that Messrs. Duthie and Condron did not sign the Merger Agreement as individuals – Mr. Duthie signed as Chairman and CEO of CorSolutions Medical, Inc., while Mr. Condron did not sign at all. But Matria argues that they are nevertheless bound to arbitrate Matria's fraud claim through agency principals or as third-party beneficiaries. Under either theory, however, Matria cannot force the plaintiffs to arbitrate claims that the Merger Agreement does not require to be arbitrated. At bottom, the third party beneficiary argument begs the very question to be decided.

Section 9.10, captioned "Third Party Beneficiaries," states that the Agreement was intended to be for the benefit of and shall be enforceable in all respects by the stakeholders. A third party

beneficiary's rights are measured by the terms of the contract and a third party beneficiary has no greater right to compel than do the signatories to the contract. *NAMA Holdings,* 922 A.2d at 431; *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.,* 269 F.3d 187, 194-195 (3rd Cir. 2001)(non-signatory may be bound to arbitrate under agency or third-party beneficiary theories where agreement to arbitrate covers the dispute). Phrased differently, if the Agreement does not require arbitration of the claims against the plaintiffs, §9.10 is not an independent basis on which Matria can require the arbitration of the claims against the plaintiffs.

Matria's agency argument also begs the question. It runs this way: Messrs. Duthie and Condron were individual Stakeholders in CorSolutions, and CorSolutions was their agent for the sale of their shares in the Merger, and they agreed as stakeholders that Coral SR would act as their "representative, agent and attorney-in-fact for all purposes under the Agreement." (Merger Agreement, § 2.4 (a)). As Coral SR agreed to be bound by the arbitration provisions of the Merger Agreement by signing the Merger Agreement, so, too, did Messrs Duthie and Condron – not to mention all 450 stakeholders – agree to be bound to the arbitration provision. From this Matria comes to the illogical conclusion that CorSolutions and/or Coral SR were the two men's agents for *everything,* including agreeing to be bound to arbitration, citing *Reinfeld v. Riklis,* 722 F. Supp. 1077, 1084-85 (S.D.N.Y. 1989) and *AFP Imaging Corp. v. Ross,* 780 F.2d 202 (2nd Cir. 1985)(*Matria's Brief in Response,* at 6-7).

The problem is that there was no blanket authorization by the stakeholders; whatever the scope of the agency it was explicitly limited the purposes authorized by the Merger Agreement, and those purposes did not include waiving a judicial forum for personal claims against them – claims which Matria's counsel has estimated could run as high as $120 million. The cases Matria relies

upon dealt with small privately held corporations, and were concerned with whether the corporate veil could be pierced given the fact that a small group of shareholders held dominion over the corporation. *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1096 (9th Cir. 2003) does not suggest that every individual shareholder in a publicly traded company unwittingly subjects themselves to arbitration of any claims against them personally when the company they invest in goes through a merger.

In short, the parties had the incentive and the skill to spell out with precision what claims they wanted to be arbitrated rather than litigated, and they did so. Claims against officers and directors personally were not among them.

## E.
## The Remaining Factors Favor Injunctive Relief

It is not merely expense that underlies the prohibition against forcing a party to arbitrate a dispute that it did not agree to arbitrate, as Matria suggests. (*Matria's Brief in Response*, at 12). Forcing Messrs. Duthie and Condron, to arbitrate deprives them of their Constitutional right to a jury trial. It is a right they can waive, *Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 808 (7th Cir. 2003), but they chose not to do so. Consequently, it is clear that they have no adequate remedy at law and will suffer irreparable harm if an injunction is not granted. *See Chicago School Reform Bd. of Trustees v. Diversified Pharmaceutical Services, Inc.*, 40 F.Supp.2d 987, 996 (N.D.Ill.1999); *Proshred Holdings Ltd. v. Conestoga Document*, 2002 WL 1067328, *6 (N.D.Ill. May 22, 2002); *FreemantleMedia-Ltd. v. Colmar, Ltd.*, 2001 WL 1360432, *2 (N.D.Ill. Nov. 5, 2001); *Raytheon Engineers & Constructors, Inc. v. SMS Schloemann-Siemag Akiengesellschaft*, 2000 WL 420866, *3 (N.D.Ill. Mar. 16, 2000); *WFC Commodities Corp. v. Alston*, 2000 WL 33534178, *1 (N.D.Ill.

Mar. 8, 2000).[11]

The only harm Matria claims it will suffer is the loss of the money and time it spent briefing this issue before the AAA Panel, and whatever further expenses it will incur in federal district court. (*Matria's Brief in Response*, at 12). That consequence is one of its own making and is not comparable to the harm the plaintiffs will suffer if the injunction is not granted. Moreover, Matria, as a practical matter, will not have meaningful relief on a merits based level by a post-arbitration challenge to the Panel's award in the district court. (*Matria's Brief in Response*, at 11). The chances of such a challenge are slim given the exceedingly narrow scope of review of arbitral decisions. *See First Options*, 514 U.S. at 942; *Halim v. Great Gatsby's Auction Gallery*, _F.3d_, 2008 WL 383284 at *4 (7th Cir. 2008).

Finally, under the circumstances here, public policy favors injunctive relief. It is the beginning and not the end of analysis to posit that there is a liberal federal policy favoring arbitration. "General propositions do not decide concrete cases," *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting), and the "'liberal policy favoring arbitration agreements ... is at bottom a policy guaranteeing the enforcement of private contractual arrangements.'" *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3rd Cir. 2001). As *First Options* has stressed, the desideratum of the Federal Arbitration Act is not expedition, but ensuring that commercial arbitration agreements, like other contracts, are enforced according to their terms and according to the intentions of the parties. 514 U.S. at 946. Here, the

---

[11] *See also Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.*, 846 F.2d 1095, 1098 (7th Cir.1988)("To say that the injury is irreparable means that the methods of repair (remedies at law) are inadequate."); 11A Wright, Miller & Kane, Federal Practice and Procedure § 2944 ("[p]robably the most common method of demonstrating that there is no adequate legal remedy is by showing the plaintiff will suffer irreparable harm if the court does not intervene . . . .").

parties' wishes were to arbitrate Escrow Fund Disputes, and Matria's claims against the plaintiffs personally are not such disputes.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction [8] is GRANTED and defendant is enjoined until further order of court from pursuing its present claims in the presently pending AAA arbitration proceeding against Messrs. Duthie and Condron.[12] The defendant has not raised the issue of bond, and there is no objective basis on which to make an independent determination of what would be an appropriate amount.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

February 22, 2008

---

[12] There is a question whether a preliminary rather than a permanent injunction is the appropriate action to take. The requirements for a permanent injunction differ only insofar as the plaintiffs must actually succeed on the merits. *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). Messrs. Duthie and Condron say it is, citing *Fried Trading Co. v. Austern*, 1989 WL 13132, *3 (N.D.Ill. Feb. 10,1989)(*Memorandum in Support of Motion for Preliminary Injunction*, at 7). But there, the court merely entered a preliminary injunction staying an arbitration proceeding to preserve the *status quo* while the parties argued and the court decided issues of arbitrability. Here, the parties have already presented briefs and oral arguments on the issue, which is a matter of contract construction. It is difficult to imagine what more could be brought to bear on this issue in the future. But perhaps there will be more and the motion only seeks preliminary relief.